IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v. 25-CR-31-JLS-MJR

MAX PIZARRO CAMPOS,

Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S PRETRIAL MOTIONS

**THE UNITED STATES OF AMERICA**, by and through its attorneys, Michael DiGiacomo, United States Attorney for the Western District of New York, and Joshua A. Violanti, Assistant United States Attorney, of counsel, hereby files its response to a specific issue in defendant's pretrial motions. Dockets 195, 283. For the foregoing reasons, the defendant's challenge under *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) and *Missouri v. Seibert, 542* U.S. 600, 621–22 (2004) (Kennedy, J., concurring in the judgment) should be denied without a hearing.

## PROCEDURAL HISTORY

On March 12, 2026, Max Pizarro Campos filed pretrial motions. Dkt. 195. The government responded on or about July 10, 2026. Dkts. 278, 279. On July 16, 2026, Max Pizarro Campos filed a reply brief. Dkt. 283. In his reply, Max Pizarro Campos asserted that the "eighty-one minute pre-warning session" on February 22, 2022, was an "interrogation" under *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980), and that the pre-warning encounter was part of an impermissible two-step interrogation method in violation

of *Missouri v. Seibert, 542* U.S. 600, 621–22 (2004) (Kennedy, J., concurring in the judgment). *See* Dkt. 283 at 20-21.

## I. THE DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS SHOULD BE DENIED.

### 1. Factual Background

On February 22, 2022, at some point, Max Pizarro Campos was taken from the scene of a New York State search warrant at his residence at 204 Hazzard Street, Jamestown, NY, and transported to the Jamestown Police Department (JPD) station. The encounter and post-*Miranda* interview were recorded. Gov't Ex. F (recorded interview on February 22, 2022). There are two primary segments of the recording. First, a pre-*Miranda* encounter between JPD Officer Alexis Carlson and Max Pizarro Campos where a conversation took place between the two. This encounter lasted about 1 hour and 21 minutes (eighty-one minutes). Second, a post-*Miranda* interview where JPD Detective Richard Hooks and Drug Enforcement Administration (DEA) Special Agent (SA) David Lauer interviewed Max Pizarro Campos after Max Pizarro Campos received Miranda *rights* and waived his *Miranda* rights.

The interaction between Max Pizarro Campos and Officer Carlson is a casual causation where Max Pizarro Campos provides volunteered information and spontaneous statements. Officer Carlson chats with Max Pizarro Campos about those subjects and asks polite follow-up questions at times. The recorded encounter between JPD Officer Alexis Carlson and Max Pizarro Campos begins with Officer Carlson removing handcuffs from Max

Pizarro Campos. (00:00:00 – 00:00:19).[1] Max Pizarro Campos thanks Officer Carlson. (00:00:09-00:00:15). Officer Carlson then advises that she and Max Pizarro Campos will wait for the detectives to arrive. (00:00:46- 00:00:50). Subsequently, Max Pizarro Campos comments about the restraints and rubs his wrists. (00:01:12-00:01:22). Officer Carlson acknowledges that the position is not comfortable. (00:01:21-00:01:22). Unprompted, Max Pizarro Campos states, "I imagine what happened ... we raised my nephew…I am going to tell you straight because I don't go on bullshit ... I got a drug problem ... I tried to quit…Maybe that's why they break the door…" (00:01:26-00:02:37). Max Pizarro Campos goes on to explain who he thinks called the police on him – his nephew's father. (00:02:08-00:02:31). Officer Carlson then asks about the needle marks on Max Pizarro Campos, "Is that what happened with your hand there? The marks and everything? (00:02:30-00:02:36). Max Pizarro Campos responds, "Yeah." *Id.* Max Pizarro Campos states "I am done with that shit." (00:02:36-00:02:41). Officer Carlson asks, "Are you saying that now because of what's going on right now? (00:02:42-00:02:48). Max Pizarro Campos responds that he has been trying to wean off. (00:02:48). Officer Carlson then references the methadone clinic. The two continue discuss Max Pizarro Campos's addiction and what he is doing to get it under control.

What is captured in the first portion of the recording is a wide-ranging casual conversation ensues primarily driven by Max Pizarro Campos. Several topics are discussed including children, family, employment, the aspects and origins of Max Pizarro Campos's drug addiction, drug treatment, Florida, home improvement, cop shows (48 hours), English

[1] The minute marks and quotations referenced from Gov't Ex. F are the product of the undersigned best efforts. The undersigned has requested a transcript from a stenographer which the undersigned will make available to the Court and defense when it is complete.

and Spanish languages, comparing legal systems and drugs in Florida and New York. Notable exchanges include that at one point, Officer Carlson tells Max Pizarro Campos being in the interview room means that detectives want to talk to him and advises Max Pizarro Campos, "Whatever you want to do with that. Play your cards how you want…" (00:15:58-00:16:32). In the same conversation makes it clear to Max Pizarro Campos, that she is a patrol officer and information is limited. At another point, Max Pizarro Campos explains he is trying to get better. (00:20:28). Officer Carlson responds that's all you can do. (00:20:30). Then, unprompted, Max Pizarro Campos states that he doesn't have anything at his residence; the drugs he gets, he uses daily and doesn't sell them; he believes he has two shotguns at the residence, which he uses for hunting deer; he does not have bullets for the shotguns; and he has drug paraphernalia at the residence. (00:20:40-00:23:10). Officer Carlson asks no follow-ups to these statements. Max Pizarro Campos further explains he does not want his kids to not what he does (i.e., taking drugs). *Id*. Officer Carlson redirects the conversation to Max Pizarro Campos's kids – asking their ages, reminding him that they know what goes on, advising him to make them priorities; and discussing school. *Id.*

In the second part of the recording, starting at about 01:21:30, Detective Hooks says "Alright, uh, we'd like to have a little conversation with you but before we can do that because you're here, I have to go through all this stuff with you." Detective Hooks then provides *Miranda* rights to Max Pizarro Campos: "Alight you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one. Do you understand each of the above rights which I have explained to you?" (01:21:53).

Max Pizarro Campos responded, "Yes." Detective Hooks then followed up: "Having these rights in mind, do you wish to talk to us now?" Max Pizarro Campos answered, "Yes." Detective Hooks read the *Miranda* warnings off a sheet of paper. Gov't Ex. G. The sheet had a waiver portion that that was acknowledged and signed by Max Pizarro Campos, Detective Hooks, and witnessed by DEA SA David Lauer. *Id.* Max Pizarro Campos signed the waiver and verbally agreed to the speak with law enforcement. During the post-*Miranda* interview, in sum and substance, Max Pizarro Campos admitted that he came into possession of a pistol through a drug transaction and that he took steps to improve the gun's functionality. Max Pizarro Campos admitted that he had a shotgun for protection. While Max Pizarro Campos made several denials of being a drug dealer, Max Pizarro Campos stated that sometimes you sell to make money. During the interview, Max Pizarro Campos also executed a consent to search form related to his surveillance system. (01:50:00). Detective Hooks asked Max Pizarro Campos to read the form and sign it. Max Pizarro Campos read the form and signed it. *See* Gov't Ex. H (consent form).

**2. <u>Legal Background</u>**

**<u>Standing</u>**

"A defendant seeking a *Miranda* suppression hearing must make more than a 'bald assertion' that the statements in question were involuntary." *United States v. Gerace*, No. 1:19-CR-86 JLS (MJR), 2020 WL 4227990, at *3 (W.D.N.Y. June 26, 2020), *report and recommendation adopted*, No. 19-CR-86 (JLS) (MJR), 2020 WL 4227374 (W.D.N.Y. July 23, 2020) (citing *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (per curiam)); *see also United States v. Hester*, No. S1 19-CR-324 (NSR), 2020 WL 3483702, at *11 (S.D.N.Y. June 26, 2020) (finding no suppression hearing necessary on *Miranda* issue where defendant did

not "indicate what statements he contends are at issue or what questions were asked," and did not "offer an affirmation of any individual with *personal knowledge* of what transpired during" the encounter) (emphasis in original). "[B]ecause the issue of custodial interrogation depends on the characterization of a set of circumstances, it is the sort of issue that requires more than conclusory assertions." *United States v. Torres*, No. 18-CR-6094-FPG, 2020 WL 4199075, at *4 (W.D.N.Y. July 22, 2020); *see also Mathurin*, 148 F.3d at 69 ("A bald assertion that a statement was involuntary, for example, could be based on any of a number of factual premises such as coercion, lack of *Miranda* warnings, or lack of competence. Without specification of the factual basis for such a characterization, the district court is not required to have a hearing.").

A defendant must "show a contested issue of material fact with respect to the issue for which the hearing was requested." *United States v. Del Rosario*, No. 12 CR 81 KBF, 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012). "In order to meet this burden, defendant must put forward some evidence that is definite, specific detailed, and non-conjectural." *Id.* "To create a factual dispute, a defendant must submit sworn factual allegations from a person with personal knowledge of the underlying facts." *United States v. Shamsideen*, No. 03 CR.1313(SCR), 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004). "Statements submitted by an attorney in motion papers before a district court 'cannot by themselves create a factual issue.'" *United States v. Washington*, No. 12 CR 146 JPO, 2012 WL 5438909, at *9 (S.D.N.Y. Nov. 7, 2012) (citing *United States v. Mottley*, 130 F. App'x 508, 509–10 (2d Cir. 2005)); *United States v. Mason*, No. S1 06CR.80 (NRB), 2007 WL 541653, at *2 (S.D.N.Y. Feb. 16, 2007) ("An affidavit of defense counsel who does not have personal knowledge of the facts and

circumstances surrounding the events at issue is an insufficient basis for an evidentiary hearing.").

***Miranda* Interrogation**

The term "interrogation" includes "express questioning" of the suspect and its "functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301; *see also United States v. Miller*, 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005). In *Innis*, the Supreme Court explained:

> [The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

446 U.S. at 301 (emphasis in the original).

Volunteered statements not in response to questions or actions by law enforcement are not the result of interrogation and do not require *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."); *see also United States v. Familetti*, 878 F.3d 53, 57-58 (2d Cir. 2017). "A defendant's volunteered,

spontaneous statements are admissible notwithstanding the absence of *Miranda* warnings." *United States v. Smalls*, 719 F. App'x 83, 85 (2d Cir. 2018) (amended summary order) (citing *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970)). "Nothing in the Fifth Amendment prohibits the police from merely listening to volunteered statements, and then using those statements at trial." *United States v. Miller*, 382 F. Supp. 2d 350, 370 (N.D.N.Y. 2005) (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)).

Interrogation does not occur when a defendant and a police officer are engaging in casual conversation. *See United States v. McConer*, 530 F.3d 484, 497 (6th Cir. 2008) (noting that a "casual background question" did not rise to the level of interrogation); *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 533 (E.D.N.Y. 2014) ("SA Ricciardi's small talk about the weather and his family, for instance, were not reasonably likely to elicit an incriminating response."). Similarly, an officer's inquiry, in response to a suspect's "muttering" may be viewed more as "the product of curiosity" than the result of interrogation. *See United States v. Thomas*, 961 F.Supp. 43, 45 (W.D.N.Y. 1997). Furthermore, an officer's limited clarifying question made in response to a suspect's unsolicited utterance does not convert a casual communication between suspect and officer into an interrogation. *See United States v. Rommy*, 506 F.3d 108, 132–34 (2d. Cir. 2007) (noting "where a person in custody volunteers incriminating information to the police, simple clarifying questions do not necessarily constitute interrogation."). "To that end, questions that a reasonable officer could not have known would illicit an incriminating response do not

amount to interrogation." *United States v. Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *14 (W.D.N.Y. June 9, 2026) (collecting cases). As the Second Circuit has further stated:

> Careful inquiry into the underlying facts and circumstances may thus be necessary to determine whether a suspect in a particular case would have reasonably understood that the follow-up questions were seeking only to clarify information already volunteered rather than to compel further incriminatory disclosures. In this respect, absent extraordinary circumstances, a court may generally conclude that follow-up questions asking only for volunteered information to be repeated or spelled do not constitute interrogation. The same conclusion might also easily apply to discrete questions seeking confirmation of what appears implicit in the volunteered disclosure. But where questions seek to "expand the scope" of volunteered statements, a more searching inquiry may be necessary to determine whether they have moved beyond neutral clarification to interrogation.

*Rommy*, 506 F.3d at 133 (footnote omitted).

"Finally, '[b]ecause the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'" *Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *15 (quoting *Rommy*, 506 F.3d at 132 (quotation and citation omitted)).

***Miranda* Warnings: Two-Step Interrogation**

"Law enforcement may not circumvent *Miranda* by engaging in a two-step interrogation process whereby a person is questioned without the proper warnings, made to confess, *Mirandized*, and then questioned again." *United States v. Pritchette*, 219 F. Supp. 3d 379, 383 (S.D.N.Y. 2016) (citing *Seibert*, 542 U.S. at 609). "The Supreme Court has laid out two approaches to determine where — as here — 'a confession obtained after a *Miranda* warning but [which was] preceded by the suspect's earlier, unwarned incriminating statements' may be subject to suppression." *United States v. Cruz*, No. 23-CR-159 (NRM),

2026 WL 2265572, at *13 (E.D.N.Y. Aug. 6, 2026) (citing *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007)); *see also Seibert*, 542 U.S. 600; *Oregon v. Elstad*, 470 U.S. 298 (1985).

"Under the first approach, laid out in *Elstad*, a post-warning confession is admissible despite an involuntary pre-warning statement unless the post-warning confession was also involuntary." *Cruz*, No. 23-CR-159 (NRM), 2026 WL 2265572, at *13 (citing *Carter*, 489 F.3d at 534). "For the statements or confession to be admissible, a defendant must have been 'fully advised of his rights and ... knowingly and voluntarily waived them.'" *Id.* (citing *United States v. Moore*, 670 F.3d 222, 233 (2d Cir. 2012)). "As to the second framework, the Second Circuit has adopted Justice Kennedy's two-fold approach in *Seibert* for cases in which a court finds that law enforcement intended to undermine *Miranda's* protections by obtaining a second inculpatory statement from a suspect who had been given the required warnings, but only after an earlier interrogation in which no such warnings were provided." *Cruz*, No. 23-CR-159 (NRM), 2026 WL 2265572, at *13 (citing *United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010)); *see also United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) ("*Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy was used to obtain the postwarning confession."). "Specifically, a statement made by a suspect during a custodial interrogation, after a *Miranda* warning has been provided, must nevertheless be suppressed if the statement is the product of a '*deliberate*, two-step strategy, *predicated upon violating Miranda*.'" *Cruz*, No. 23-CR-159 (NRM), 2026 WL 2265572, at *13 (citing *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring)) (emphasis added); *see also Hernandez v. McIntosh*, 146 F.4th 142, 158 (2d Cir. 2025) ("In *Seibert*, the Supreme Court held unconstitutional then-common tactic of intentionally obtaining an inadmissible, un-*Mirandized* confession, administering a

*Miranda* warning after the suspect had confessed, and finally asking the suspect to repeat the confession post-warning.").

"In considering whether law enforcement deliberately engaged in a two-step interrogation process, the court 'should review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness.'" *Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *7 (citing *Williams*, 681 F.3d at 41). Under the objective evidence analysis, courts are guided by five factors:

> (1) "the completeness and detail of the questions and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and the second," interrogations, (4) "the continuity of police personnel" doing the questioning, and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."

*Id.* at *7–8 (citing *United States v. Medina*, 19 F. Supp. 3d 518, 543 (S.D.N.Y. 2014) (quoting. *Moore*, 670 F.3d at 228)). "The Second Circuit also recognizes that in most instances the first inquiry will rely heavily on objective evidence to determine deliberateness, although the totality of the subjective and objective evidence should be considered." *Cruz*, No. 23-CR-159 (NRM), 2026 WL 2265572, at *14 (citing *Capers*, 627 F.3d at 479). "As to subjective evidence of intent, a court should conduct 'a somewhat closer scrutiny of an investigator's testimony ... when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances.' " *Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *8 (quoting *Medina*, 19 F. Supp. 3d at 543 (quoting *Moore*, 670 F.3d at 229)).

"[T]he Government bears the burden of disproving by a preponderance of the evidence that it employed a deliberate two-step strategy." *Id.* (quoting *Williams*, 681 F.3d at 41); *see*

*also United States v. Myrick*, No. 1:22-CR-00175-JLS-MJR, 2025 WL 1787630, at *6–8 (W.D.N.Y. May 1, 2025), *report and recommendation adopted*, No. 22-CR-175 (JLS) (MJR), 2025 WL 1785284 (W.D.N.Y. June 27, 2025) ("When evaluating whether law enforcement engaged in a deliberate two-step strategy for the purpose of circumventing *Miranda*, the government bears the burden of disproving the deliberateness by a preponderance of the evidence.") (citing *Capers*, 627 F.3d at 479-80).

**3. <u>The Defendant's Argument Under *Innis* and *Seibert* Should Be Denied and/or Deemed Waived.</u>**

In pertinent part, the Court's scheduling order in this case stated:

> All pretrial motions, both dispositive and non-dispositive, including all supporting papers and memoranda of law in support thereof, shall be filed [on a date certain]…
>
> Defendants' replies including identification of the areas of dispute that remain following the government's response…
>
> Failure by any party to raise defenses or objections, or to make requests which must be made prior to trial or at the time set forth in this scheduling order or prior to any extension made by the court shall constitute a waiver thereof.

Dkt. 177.

The Court's Order is consistent with the Federal Rules of Criminal Procedure. Under the Federal Rules of Criminal Procedure, a party who fails to do bring a specific challenge "waives any Rule 12(b)(3) defense, objection, or request," although "[f]or good cause, the court may grant relief from the waiver." Fed.R.Crim.P. 12(e); Fed.R.Crim.P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. Rule 47 applies to a pretrial motion."); Fed.R.Crim.P. 47(b) ("A motion--except when made during a trial or hearing--must be in writing, unless the

court permits the party to make the motion by other means. A motion must state the grounds on which it is based and the relief or order sought. A motion may be supported by affidavit.").

"This waiver rule applies not only when a defendant fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file." *United States v. White*, 584 F.3d 935, 948–49 (10th Cir. 2009) (citations omitted). "To avoid waiving a particular argument, the party must make 'sufficiently definite, specific, detailed and nonconjectural factual allegations supporting his suppression claim' in his pretrial motion..." *Id.* (citations omitted); s*ee also United States v. Stegemann*, 701 F. App'x 35, 38 (2d Cir. 2017) (summary order) ("Buried in Stegemann's voluminous pretrial motions were two conclusory sentences alleging that aerial footage had to be suppressed because the surveillance violated his (unspecified) rights. In contravention of the court's local rules, the motion in which these sentences appeared did not describe the aerial surveillance or cite any supporting legal authority. The district court acted within its discretion by treating this perfunctory, undeveloped argument as forfeited.") (footnote omitted). Furthermore, "any arguments 'raise[d] for the first time in [a defendant's]... reply brief are forfeited.'" *United States v. Marseet*, No. 6:24-CR-6032 (BKS), 2025 WL 90647, at *2 n.3 (W.D.N.Y. Jan. 14, 2025), *reconsideration denied*, No. 6:24-CR-6032 (BKS), 2025 WL 606551 (W.D.N.Y. Feb. 25, 2025), *appeal dismissed* (Dec. 12, 2025) (alteration in original) (citing *United States v. Davis*, 122 F.4th 71, 78 (2d Cir. 2024)) "The forfeiture rule, which is 'regularly appl[ied]' to *pro se* litigants, means that issues raised for the first time in a reply brief are generally deemed waived and courts need not consider such arguments." *Id.* (citing *Davis*, 122 F.4th at 78 and *United States v. Karimu*, 470 F. App'x 45, 46 (2d Cir. 2012)).

As stated in more detail below, Max Pizarro Campos's challenge under *Innis* was not raised properly in a detailed, specific manner in either his original motion or his reply brief. His argument lacks sufficient factual and legal development. It is conclusory and underdeveloped. *See United States v. Murphy*, No. 25-CR-218 (LAP), 2026 WL 1453592, at *3 (S.D.N.Y. May 22, 2026) ("Defendant, in a single sentence, also offers what the Court construes as a nexus challenge. As a threshold matter, the Court finds that this 'perfunctory, undeveloped argument [is] forfeited.'") (internal citation omitted) (citing *Stegemann*, 701 F. App'x at 38). Furthermore, Max Pizarro Campos did not bring a challenge under *Seibert* in his original omnibus motion. *Seibert* is not cited in the original omnibus motion. Nor is the concept of a two-step interrogation identified or discussed. *Seibert* was raised in a conclusory fashion for the first time in reply brief and should be deemed forfeited. *See* Defendant's Reply at 27 (one paragraph) (noting that "The detectives arrived to a subject already softened by an eighty-one minute engagement in the same room. What Detective Hooks and Special Agent Lauer knew of that conversation (whether they monitored it, were briefed on it, or assigned it) is a question the government must answer, under oath, at a hearing.").

**4. <u>The Defendant Has Failed to Submit a Sufficient Motion on His *Innis* and *Seibert* Challenges.</u>**

Max Pizarro Campos raised a barebones argument in his original motion as to the *Innis* and in his reply to both *Innis* and *Seibert*. While *Innis* is cited in Max Pizarro Campos's original filing, the argument is factually and legally insufficient. Defense counsel's original affidavit spends a sentence on it: "The video statement contains two portions: a pre-*Miranda* portion during which Max was questioned by a Jamestown Police Officer without being advised of his rights, lasting around an hour and twenty-one minutes…" Yellen Declaration at 4. Max Pizarro Campos's original omnibus motion spends almost the same amount of

space and specificity to the issue: "The pre-*Miranda* statements should be suppressed. Statements do not pass constitutional muster when made in custodial interrogation without *Miranda* warnings." Defendant's Omnibus Motion at 21 (citing *Dickerson v. United States*, 530 U.S. 428, 431 (2000)). Max Pizarro Campos has not appropriately identified which, if any, statements are incriminating and which are not in the pre-*Miranda* interview or post-*Miranda* interview. *See*, *e.g.*, *Hester*, No. S1 19-CR-324 (NSR), 2020 WL 3483702, at *11 ("At no point does Defendant indicate what statements he contends are at issue or what questions were asked. Nor does he offer an affirmation of any individual with personal knowledge of what transpired during his transportation (including himself)."). As Judge Geraci articulated in *Torres*, No. 18-CR-6094-FPG, 2020 WL 4199075, at *4, this is problematic to Max Pizarro Campos's *Miranda* related challenges:

> Most noticeably, Defendant failed to identify what statements he contends were elicited in violation of *Miranda*. Even in his brief to this Court, Defendant does not identify what specific statements he seeks to suppress. That is obviously the fundamental prerequisite for a claim for suppression under *Miranda*. Defendant's vague allusions to "statements allegedly made by the defendant to law enforcement" fail to meet this decidedly minimal burden. Such specificity is necessary because it is only when the relevant statements have been identified that a court can then determine if there are issues of fact concerning whether the statements were made during custodial interrogation, and, therefore, whether an evidentiary hearing is necessary.

*Id.* (internal citation omitted).

Max Pizarro Campos's reply argument is similarly conclusory. In his reply, Max Pizarro Campos puts forth a conclusory argument without any affidavit or sworn statement asserting that the "eighty-one minute pre-warning session" on February 22, 2022, was an "interrogation" under *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) and that the pre-warning encounter between him and a JPD officer was part of an impermissible two-step interrogation method in violation of *Seibert, 542* U.S. at 621–22 (Kennedy, J., concurring in

the judgment). *See* Defendant's Reply at 20-21 ("In a fentanyl-conspiracy and § 924(c) prosecution, a suspect's drug addiction, the origins of that addiction, his treatment history, and his criminal record are not pedigree topics or weather talk; they are the subject matter of the prosecution itself …. Under *Innis*, the question is whether officers 'should know' their words or actions are 'reasonably likely to elicit an incriminating response.' An officer assigned to sit with a fentanyl-case arrestee for eighty-one minutes, handcuffs removed, food and drink provided, while drawing out the story of his addiction and his record, should know exactly that.") (internal citation omitted). Merely using the term of "interrogation" does not make Max Pizarro Campos subject to it. One simply cannot watch the eighty-one minute encounter between Max Pizarro Campos and Officer Carlson and declare every statement was the by-product of interrogation or its functional equivalent. Commonsense and the evidence show otherwise.

Max Pizarro Campos has not adequately explained how he was interrogated by Officer Carlson. Most likely because he cannot. He has not identified which, if any, statements are incriminating and which are not, in the pre-*Miranda* interview. If Max Pizarro Campos is now claiming that the information related to his drug addiction, the origins of that addiction, his treatment history, and his criminal record are the incriminating statements, he has failed to adequately grapple with the case at hand. He has failed to identify Officer Carlson's questions and failed to explain how any statements in response are actually incriminating in the context of the search warrant on February 22, 2022, and with his own volunteered information and spontaneous statements. Simply, Max Pizarro Campos's *Innis* challenge in both his original motion and reply was conclusory and lacked substantive factual or legal development. *See Stegemann*, 701 F. App'x at 38 (affirming the district court's finding that

defendant's challenge to aerial surveillance made in two conclusory sentences "[b]uried in ... voluminous pretrial motion"" was "waived as insufficiently raised"). *Cf. United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks and citation omitted)

Nor has Max Pizarro Campos meaningfully grappled with the circumstances and information of the pre-*Miranda* and post-*Miranda* interviews. He fails to substantively address the five *Seibert* factors and their application to the circumstances of February 22, 2022. *See Moore*, 670 F.3d at 230 ("Although the five *Seibert* factors were developed by the plurality to gauge whether the later *Miranda* warnings 'could be effective enough to accomplish their object,'… they likewise will often serve as helpful indicia for whether an alleged two-step interrogation was intended to circumvent *Miranda* …. We therefore use the plurality's five factors not to weigh the effectiveness of the later *Miranda* warnings, but to shed light on the detectives' intent.") (internal citations omitted)). Max Pizarro Campos has not explained his view on the completeness and detail of the pre-*Miranda* interaction versus post-*Miranda* interview. He has not addressed if there is overlapping content between the pre-*Miranda* encounter and post-*Miranda* interview. The government and the Court must make their own educated guesses. Max Pizarro Campos has not addressed how DEA SA Lauer or JPD Detective Hooks's ***questions*** treated the post-*Miranda* interview as continuous with the pre-*Miranda* encounter. Most likely because he cannot. Max Pizarro Campos's best and only argument is that Officer Carlson "already softened" Max Pizarro Campos by the time the investigators conducted their post-*Miranda* interview. That factor seems to be divorced from the *Seibert* factors. It appears more akin to claiming Max Pizarro Campos's will was

overborne by a casual conversation with a non-investigating patrol officer before he was Mirandized by separate officers and asked targeted questions about his actual criminality. He has provided no affidavit with personal knowledge explaining his thoughts on the matter.

Most notably, Max Pizarro Campos has not acknowledged what is plain in the recording: Max Pizarro Campos engaged in a casual conversation with a non-investigating officer where he volunteered certain information and made spontaneous statements and answered questions that followed up on subjects he himself brought up. If this was a deliberate two-step interrogation, it was poorly executed and obtained few if any incriminating statements in response to actual interrogation. The incriminating topics, he did bring up – drug possession and firearms possession – were volunteered information and not substantively followed up on.

Max Pizarro Campos's cursory argument is compounded by the fact he has offered no affidavit or declaration about the interview or circumstances on February 22, 2022.[2] This is noteworthy because "the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'" *Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *15 (quoting *Rommy*, 506 F.3d at 132); *see also Del Rosario*, No. 12 CR 81 KBF, 2012 WL 1710923, at *2

[2] "Experience shows that unless such serious charges are initiated upon the sworn statement of persons having personal knowledge of the facts, a great deal of time of the parties and the Court is frequently wasted upon unnecessary, expensive and protracted suppression hearings, all for the reason that the attorney demanding suppression merely upon his own say-so often discovers only at the hearing that he had been misled by unsworn misrepresentations of his clients, which they would be unwilling to swear to in an affidavit, particularly if they were questioned closely by their counsel and warned of the consequences of perjury." *United States v. Thornton*, No. 3:06CR0059 AWT, 2006 WL 3332985, at *2 (D. Conn. Nov. 16, 2006) (citing *United States v. Garcia*, 272 F.Supp. 286, 290 (S.D.N.Y.1976)).

("Defendant could have, but has not, submitted an affidavit in support of his motion. He has therefore not put forward a single fact upon which this Court could base a decision that he has met the required legal standard for an evidentiary hearing.") The government and the Court are left with nothing to evaluate in that regard besides the video recording – which shows that Max Pizarro Campos did not view the conversation as an interrogation. In fact, in the recording, Max Pizarro Campos compliments Officer Carlson to Detective Hooks and SA Lauer and her understanding of addiction. To date, defense's legal and factual arguments are not enough to move forward with this challenge. The Court should deny his insufficient *Innis* and newly raised *Seibert* challenges without a hearing.

Now with the benefit of hindsight and the government's original response and the instant response, Max Pizarro Campos will have a further advantage in filling out his arguments. While the Court has provided an opportunity for the government to respond to the newly raised argument, the government's ability to do so is limited. Instead, what is likely to occur is that defense will respond to the government's highlighted deficiencies with even newer raised arguments and factual disputes – delaying this case further and denying a meaningful opportunity to the government to respond to this challenge. This is not how pretrial litigation should occur. The Court's own order says so. The Court should consider the *Seibert* argument waived or forfeited. In addition, the Court should not allow further expansion of Max Pizarro Campos's *Innis* and *Siebert* arguments in reply to this government's response.

**5. <u>The Defendant was Not Interrogated.</u>**

The first question for the Court to assess is whether "the initial statement, though voluntary, [was] obtained in violation of the defendant's *Miranda* rights." *Moore*, 670 F.3d at

229; *United States v. Smith*, No. 5:12-CR-52, 2012 WL 5187922, at *9 (D. Vt. Oct. 18, 2012) ("As the threshold for any *Seibert* inquiry, the Second Circuit has required a 'straightforward analysis' asking '[f]irst, was the initial statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further.'") (citing *Moore*, 670 F.3d at 229 (citing *United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006)). "If not, there could have been no deliberate two-step strategy and the inquiry is at an end." *United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at *7 (D. Conn. July 24, 2018).

Max Pizarro Campos's pre-*Miranda* statements were by-products of casual conversation and spontaneous and volunteered statements. During large portions of the recorded interaction between Max Pizarro Campos and JPD Officer Carlson, the two engaged in casual conversation where Max Pizarro Campos made spontaneous statements and volunteered information. While Officer Carlson may have asked follow-up questions at the time, there is nothing nefarious behind it. She did not substantively expand the scope of the topics that Max Pizarro Campos brought up on his own accord. The recording and Officer Carlson's affidavit show that no interrogation took place. *See* Gov't Ex. A (Officer Carlson's affidavit).[3] In fact, when given the opportunity to expand on Max Pizarro's unprompted incriminating information about drugs and guns at the residence, Officer Carlson asked no follow-ups and redirected the conversation. The recording and Officer Carlson's own affidavit demonstrates that Officer Carlson's questioning was far from "systematic,

[3] A court may consider a law enforcement officer's subjective intent. *See Williams*, 681 F.3d at 41, 43; *Moore*, 670 F.3d at 229. "As to subjective evidence of intent, a court should conduct 'a somewhat closer scrutiny of an investigator's testimony ... when the proffered rationale is not a 'legitimate' reason to delay or where it 'inherently lacks credibility' in view of the 'totality of the circumstances.' " *Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *8 (quoting *Medina*, 19 F. Supp. 3d at 543 (quoting *Moore*, 670 F.3d at 229))).

exhaustive, and managed with psychological skill," such that "little, if anything, of incriminating potential [was] left unsaid." *Williams*, 681 F.3d at 44 (quoting *Seibert*, 542 U.S. at 616); *Moore*, 670 F.3d at 231 ("As opposed to *Seibert*—where the initial 'questioning was systematic, exhaustive, managed with psychological skill,' and left 'little, if anything, of incriminating potential ... unsaid,'—here the initial questioning was brief and spare.") (citation omitted).

Max Pizarro Campos voluntarily initiated the conversation with Officer Carlson. He chose the topics, not Officer Carlson. The Second Circuit's discussion in *United States v. Rommy*, 506 F.3d 108, 134–35 (2d Cir. 2007) is instructive:

> Although Rommy claimed that the agents asked more than follow-up questions at the Madrid meeting, nothing in the record indicates clear error in the district court's contrary conclusion. As the district court expressly found, Rommy not only "voluntarily initiated the meeting with the DEA agents," he "chose the subjects" discussed. Agent Fernandez testified without contradiction at trial that, because he knew nothing about Rommy's drug activities or the activities of the persons named, the Madrid meeting was basically a narrative by Rommy, punctuated only by questions to clarify the spellings or dates of information being volunteered and, on one occasion, to understand a drug abbreviation. On *de novo* review of Rommy's legal challenge, we conclude that such questions did not transform the meeting into an interrogation requiring the advice or waiver of *Miranda* rights. Nothing in the record supports a conclusion that Rommy could have perceived the agents to be seeking incriminating information beyond what he had already volunteered.

*Id.* (internal citations and footnotes omitted).

### 6. <u>There Was No Two-Step Interrogation Under *Seibert*.</u>

Under the totality of the circumstances and *Seibert* factors, there was no deliberate, two-step interrogation because Officer Carlson's encounter did not have complete and detailed questions; there was very little overlapping content of encounter and post-*Miranda*

interview; there was different police personnel; and that the post-*Miranda* interviewer's questions did not treat the encounter with Officer Carlson as continuous.

There is no dispute that Officer Carlson did not *Mirandize* Pizarro Campos. But there is no colorable evidence to support that Officer Carlson, JPD Detectives or DEA agents deliberately engaged in a two-step interrogation technique. There is no evidence to support that Officer Carlson did or even intended to conduct an interrogation of Max Pizarro Campos. The recording, Officer Carlson's affidavit, and the lack of any evidence otherwise, show Officer Carlson did not engage in interrogation or a two-step interrogation process.

***The Completeness and Detail of the Questions and Answers in the First Round of Interrogation.***

This factor supports that there was no deliberate two-step interrogation. "[T]he questions and answers in the first round of interrogation were neither complete nor detailed." *Williams*, 681 F.3d at 44. Most of the encounter was driven by Max Pizarro Campos and his own selected topics of conversation. Max Pizarro Campos volunteered information and made spontaneous, unprompted statements. He controlled the topics and the conversation in general. When Officer Carlson did engage in questions, they were limited and not targeted at finding drug suppliers, customers, conspirators, or associates. She did not ask about drug dealing. Her questions were related to the subject matter discussed by Max Pizarro Campos. The recording clearly shows that Officer Carlson's questions and Max Pizarro Campos were not complete or detailed with the pending search warrant results and drug investigation. Nor did Officer Carlson's questions expand the scope of Max Pizarro Campos's information. It is evident from the recording that Officer Carlson did not intend to question Max Pizarro Campos about his drug trafficking or unlawful firearms possession or possession of stolen property activities. Officer Carlson's sworn affidavit confirms it. When Officer Carlson's

encounter is compared with the post-*Miranda* interview, the contrast is stark. Officer Carlson's encounter and her questions were not detailed or complete. Officer Carlson authored no report about any incriminating statements and filed no 710.30 notice under New York State Criminal Procedure Law. *See Gogolack*, No. 1:23-CR-00099 EAW, 2026 WL 1692618, at *10 ("To that end, in the Court's view, the lack of a formal report from these interactions underscores that the FBI did not intend to and did not interrogate Gogolack when Agent Kammeraad conversed with him at Donna Court."). Max Pizarro Campos has offered nothing to say otherwise.

***Overlap.***

This factor also supports that there was no deliberate two-step interrogation. "Where there is little overlap between the two interrogations, this factor weighs in favor of the Government." *United States v. Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040, at *19 (S.D.N.Y. July 16, 2018). The encounter with Officer Carlson and post-*Miranda* interview interviews differed significantly in scope and content. Max Pizarro Campos's statements during his encounter with Officer Carlson were wide-ranging and included many topics. By contrast, the post-arrest *Miranda* interview was focused on Max Pizarro Campos's drug dealing and information he had about it in and around Jamestown, NY. The post-*Miranda* interview was formal. The agent interviewers' questions and their sought details and answers were not the same focus during his encounter with Officer Carlson. Investigators did not focus on Max Pizarro Campos's background, drug treatment, family, employment, Officer Carlson did. DEA SA Lauer and JPD Detective Hooks were focused on drug dealing, Officer Carlson was not. Unlike the interviewing agents, Officer Carlson did not ask where Max Pizarro Campos bought his drugs or his alleged drug dealing. *See Medina*, 19 F. Supp. 3d at 545 ("Critical to the Court's determination is the fact that Medina made no admissions

concerning the July 28 shootings during Crisfield's initial interrogation. The later interrogation did not involve a re-plowing of ground already plowed by Crisfield."). Officer Carlson did not ask about his purchasing or acquiring firearms. Max Pizarro Campos discussed his drug dealing and firearms activities with agents in more detail. *See Carter*, 489 F.3d at 536 ("Because this was the only incriminating statement made by Bearam before he received the warnings, there was almost no overlap between this statement and the full confession he gave after he received the warnings."). Instead, Officer Carlson engaged in topics selected by Max Pizarro Campos. Thus, post-*Miranda* interview covered substantially more incriminating subjects relevant to an actual investigation than covered by Officer Carlson.

Here, "[a]ny overlap between the two interviews was at most minor." *Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040, at *19. The recording shows that Max Pizarro Campos "was not led 'to cover the same ground a second time'—the type of objective evidence that raises *Seibert* deliberateness concerns because it suggests a focused attempt to make the defendant feel locked into his recently elicited inculpatory statements." *Williams*, 681 F.3d at 44 (citing *Seibert*, 542 U.S. at 604); *Carter*, 489 F.3d at 536 (finding "almost no overlap" between single incriminating statement "regarding the contents of one of the bags of narcotics" and "full confession [defendant] gave after he received the warnings"); *see also Moore*, 670 F.3d at 232 ("Whereas the initial questioning focused exclusively on the location of the gun, the second questioning was broad and systematic: it focused on the attempted robbery and carjacking, where Moore got the gun, who else in town had guns, and whether Moore had any information about cold homicide cases. The two rounds of questioning did not appreciably overlap."); *United States v. Stewart*, 536 F.3d 714, 722 (7th Cir. 2008) ("[T]he

lack of overlap between the warned and unwarned statements is evidence that the interrogator did not deliberately use a two-step strategy designed to circumvent *Miranda*.").

***Timing and Setting.***

This factor is at best neutral for the defendant. While both the pre-*Miranda* encounter and post-*Miranda* took place at the Jamestown Police Station, police station, the encounter began when Max Pizarro Campos initiated a conversation with Officer Carlson, a non-investigating officer. Officer Carlson was not involved in the investigation of Max Pizarro Campos. *Cf. Moore*, 670 F.3d at 232 ("The circumstances of the interrogations likewise favor the government. Although both rounds of questioning took place within the police station….In combination, these facts suggest that, although Pine questioned Moore about the location of the gun and the district court suppressed Moore's response, Pine did not initiate this questioning as part of a two-step interrogation.").

***Continuity of Personnel.***

This factor supports that there was no deliberate two-step interrogation. There was no "continuity of police personnel" in the pre-*Miranda* encounter and post-*Miranda* interview. *See Moore*, 670 F.3d at 232 (quoting *Seibert*, 542 U.S. at 615). "In *Seibert*, the same officer did the questioning both times. Similarly, the lead postal investigator who set up the sting operation in *Capers* did the questioning before and then again after the defendant had been advised of his rights." *Id.* (internal citations omitted) (citing *Seibert*, 542 U.S. at 605, 616 and *Capers*, 627 F.3d at 473, 483). Here, the initial encounter and conversation was between Officer Carlson, a non-investigating officer, and Max Pizarro Campos. Detective Hooks and DEA SA Lauer then interviewed Max Pizarro Campos without Officer Carlson present. Officer Carlson had no role in Max Pizarro Campos's post-*Miranda* interview. Neither did the information she had received. While defense counsel highlights *United States v. Pritchette*,

219 F. Supp. 3d 379, 387 (S.D.N.Y. 2016) for support that "the presumption of compulsion extended to a later interrogation by a different interrogator", that case's application does not make sense here. As the district court in *Pritchette* noted: "Here, the agents made clear from the beginning of the interrogation that it was a continuation of the April interrogations. The video reveals that the first tactic employed was to remind Pritchette that he had already confessed, and that the records of the prior confession had been reviewed." *Id.* None of that happened here.

***The Degree the Interrogator's Questions Treated the Second Round as Continuous with the First.***

This factor supports that there was no deliberate two-step interrogation. There is no evidence that DEA SA Lauer and Detective Hooks treated their post-*Miranda* interview as continuous. None of the interviewing agents' questions indicate that the agents treated the post-Miranda interview round as continuous with the encounter between Officer Carlson and Max Pizarro Campos. Nothing in the recording suggests that the post-*Miranda* session was essentially a cross-examination using information gained during the encounter with Officer Carlson. This case is more akin to the circumstances in the Second Circuit's decision in *Moore*, where "the second interview was not treated as a continuation of the first, nor did the investigators use the information obtained from [the first round] questioning to cross-examine -defendant] or compel him to answer due to the weight of an earlier admission," *Moore*, 670 F.3d at 232 (internal citations omitted). Furthermore, "[i]n [the Second Circuit's decision in] *Capers*, a 90–minute break between questioning was insufficient. But there, both encounters were inquisitorial and conducted by the same inspector, who was leading the investigation and had planned the sting operation …. in *Capers*, the latter session was 'essentially a cross-examination using information gained during the first round of interrogation.'" *Id.* at 232 (internal citations omitted). This case does not present circumstances similar to *Capers*. A

non-investigating officer sat with Max Pizarro Campos for some time and engaged in a casual conversation while different investigators conducted interrogation post-*Miranda* thereafter. The affidavit and recording clearly show that both encounters were not inquisitorial – one was (DEA SA Lauer and Detective Hooks), one was not (Officer Carlson). They also showed post-*Miranda* session was not a cross-examination of information found out in the first session.

***Subjective Evidence.***

Officer Carlson's affidavit makes clear that she had limited role and knowledge during the encounter with Max Pizarro Campos on February 22, 2022. *See* Gov's Ex. A. She had no intent to engage in a two-step interrogation of Max Pizarro Campos. *See Moore*, 670 F.3d at 231 (finding that there was "no subjective evidence of intent here—no testimony, for example, by any officer of an intent to use a two-step technique, nor any evidence that such intent was reflected in a police report …. Nor is there any objective evidence that such a technique was used."). She was not coached or instructed to do so. Rather, she engaged in a casual conversation where Max Pizarro Campos primarily volunteered information and made spontaneous statements.

***Conclusion.***

There was no evidence of intent to engage in a two-step interrogation technique. The credible and consistent evidence supports that Officer Carlson did not interrogate Max Pizarro Campos on behalf of investigators. Detective Hooks and SA Lauer only sought to interview Max Pizarro Campos after he was properly *Mirandized*. The conduct here does not involve "[t]he quintessential two-step [interrogation] technique [at issue in *Seibert* ]." *Williams*, 681 F.3d at 45. Max Pizarro Campos "was not given *Miranda* ' 'warnings only in the aftermath of interrogation and just after making a confession,' with the police 'leading him over the same ground again'' in a second interrogation." *See Medina*, 19 F. Supp. 3d at

543 (finding the same) (citing *Williams*, 681 F.3d at 45 (quoting *Seibert*, 542 U.S. at 613)). Max Pizarro Campos did not give a full confession as to his drug dealing, stolen property, or acquisition of the firearms. In fact, he denied many of those things even in the post-*Miranda* interview. *See Carter*, 489 F.3d at 536 ("This stands in stark contrast to the *Seibert* case, where the defendant gave a full confession before receiving the warning and then was essentially cross-examined about her confession into a tape recorder after having been given the warning."). The recording and affidavit clearly show that Officer Carlson did not engage in the police conduct that *Seibert* sought to address:

> The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.

*Seibert*, 542 U.S. at 616 (plurality); *see also Bracey v. Graham*, No. 16-CV-7919, 2020 WL 12178000, at *30 (S.D.N.Y. Apr. 27, 2020), *report and recommendation adopted*, 2021 WL 4950890 (S.D.N.Y. Oct. 25, 2021) (noting that *Seibert* "prohibits police interrogators from intentionally withholding *Miranda* warnings as a tactic to aid in obtaining an incriminating statement, and then re-eliciting the same statement after giving the warnings.")).

**6. <u>The Defendant Validly Waived His *Miranda* Rights and Statements Were Voluntarily Made.</u>**

Because there was "no two-step process…employed here, the only inquiry left is whether Defendant's second statement to the detectives was voluntary." *Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040, at *20.

Max Pizarro Campos was advised of his *Miranda* rights, indicated that he understood them, and voluntarily agreed to speak to law enforcement. He signed a written waiver form. Detective Hooks's reading of *Miranda* rights were clear, understandable, deliberate, and measured. After receiving the *Miranda* warnings and clearly waiving them both orally and in writing, Max Pizarro Campos engaged in an extensive conversation with law enforcement where he was responsive to the officers' questions and engaged in dialogue. At no time did Max Pizarro Campos ask to speak to a lawyer, say that he wanted the interrogation to end, or that he wished to remain silent. The recorded documentary evidence demonstrates that Max Pizarro Campos's statements were made following a knowing, voluntarily, and intelligent waiver of his *Miranda* rights. The characteristics of Max Pizarro Campos support a valid, voluntary waiver in this case. The conditions of the interrogation and the conduct of the law enforcement officers support a valid, voluntary waiver of Max Pizarro Campos's *Miranda* rights.

Max Pizarro Campos's statements throughout the interview support a valid waiver and voluntary admissions. He engaged in a casual conversation with law enforcement. He listened to questions and answered. He made denials. He complimented law enforcement. He indicated he understood what law enforcement was saying. Notably, the circumstances surrounding Max Pizarro Campos's questioning did not involve any physical force, "psychological duress, threats, [or] unduly prolonged interrogation…" *See Moore*, 670 F.3d at 233 (citing *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010) (citation omitted)). "In total, the characteristics of Defendant, the conditions of the interrogation, the conduct of the law enforcement officers present, and Defendant's statements throughout the interrogation all suggest that the inculpatory statements and the waiving of Defendant's rights were

voluntary." *United States v. Mitchell*, No. 1:24-CR-00146 (AMN), 2025 WL 2355679, at *6 (N.D.N.Y. May 7, 2025); *see also Tirado*, No. 1:17-CR-668-GHW, 2018 WL 3432040, at *21.

**7. At Trial, the Government is not Offering the Defendant's Casual Conversation with the JPD Patrol Officer Directly Against Him.**

Most of Max Pizarro Campos's statements to Officer Carlson are not evidentiary in nature. The government does not plan to directly elicit any statements from this encounter with Officer Carlson at trial. Because Max Pizarro Campos's statements were voluntarily made, the government may use them to impeach him should he testify. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 226 (1971); *United States v. Gullett*, 75 F.3d 941, 946 (4th Cir. 1996).

## CONCLUSION

Based upon the foregoing, the defendant's motion as to his *Innis* and *Seibert* challenges should be denied.

DATED: Buffalo, New York, August 24, 2026.

MICHAEL DIGIACOMO
United States Attorney

BY: s/JOSHUA A. VIOLANTI
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5864
Joshua.Violanti@usdoj.gov